519 F.Supp. 124 (1981)
Charles E. SWEENEY, and Adele Schenberg, Plaintiffs,
and
Rory Riddler, Dorothy Light, and Juanita Briggs, Plaintiffs-Intervenors,
v.
Christopher S. (Kit) BOND, Individually and as Governor of the State of Missouri; Ray S. James, Individually and as Director of the Department of Revenue of the State of Missouri; Ernestine Beckman, and Gerard J. Schmidt, Defendants.
No. 81-261C(5).
United States District Court, E. D. Missouri, E. D.
May 19, 1981.
On Motions July 2, 1981.
*125 Irl B. Baris, St. Louis, Mo., Frederick W. Drakesmith, St. Charles, Mo., for plaintiffs.
Michael Boicourt, Asst. Atty. Gen., Jefferson City, Mo., Kenneth M. Romine&sacute;, Leland B. Curtis, St. Louis, Mo., for defendants.
On Post-Trial Motions July 2, 1981.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT
CAHILL, District Judge.
This matter is before the Court for judgment on the merits.
Charles Sweeney and Adele Schenberg, plaintiffs, brought this action against the defendants, Missouri Governor Christopher S. (Kit) Bond, Director of Revenue Ray James, and others, under 42 U.S.C. § 1983. Plaintiffs allege that their appointments as (motor vehicle license and tax) fee agents for the State of Missouri are being terminated because of the plaintiffs' political affiliation, and thus, in violation of their First Amendment rights, as defined by recent decisions of the U. S. Supreme Court. Fee agents Rory Riddler, Juanita Briggs, and Dorothy Light later intervened as plaintiffs. The defendants contend that fee agents are not employees of the State of Missouri, and thus, their appointments may properly be terminated because of their political affiliation. Defendants submit that even if the fee agents are state employees, political affiliation is nonetheless an appropriate requirement for appointment. The defendants also assert that plaintiffs were terminated for cause.
This matter was tried before the Court without a jury on April 16 and 17, 1981.
After consideration of the pleadings and briefs, the testimony adduced at trial, the exhibits introduced into evidence, and the applicable law, the Court makes the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is adopted as such, and conversely, any conclusion of law equally applicable as a finding of fact is so adopted.

Findings of Fact
1. The plaintiffs, Charles Sweeney, Adele Schenberg, Rory Riddler, Juanita Briggs, and Dorothy Light, are fee agents for the Missouri Department of Revenue. All of the plaintiffs are active Democrats and all were appointed as fee agents during the administration of former Governor Joseph Teasdale, also a Democrat.
2. Defendant Christopher Bond is now the Governor of Missouri. Shortly after his inauguration on January 12, 1981, Governor Bond appointed defendant Ray S. James as the Director of Revenue. Both Bond and James are Republicans. Defendants Ernestine Beckman and Jerry Schmidt are persons appointed by defendant James as successor fee agents for Sweeney and Schenberg, respectively.
3. All of the plaintiffs, with the exception of Dorothy Light, have been notified by defendant James that their appointments *126 as fee agents are being terminated.[1] With the exception of the office of plaintiff Riddler, James has appointed successors to operate the fee agent offices held by the plaintiffs. All of the persons appointed by James to replace the plaintiffs are Republicans.
4. Fee agents are authorized under Mo. Rev.Stat. § 136.055 to issue licenses and collect taxes and fees. That statute provides:
1. Any person who is selected or appointed by the state director of revenue to act as an agent of the department of revenue, whose duties shall be the sale of motor vehicle licenses and the collection of motor vehicle sales and use taxes under the provisions of section 144.440, RSMO, and who receives no salary from the department of revenue shall be authorized to collect from the party requiring such services additional fees as compensation in full and for all services rendered on the following basis:
(1) For each motor vehicle or trailer license sold, renewed, or transferred  one dollar;
(2) For application or transfer of title  one dollar;
(3) For each chauffeur's, operator's or driver's license  one dollar;
(4) No notary fee or other fee or additional charge shall be paid or collected.
2. This section shall not apply to agents appointed by the director of revenue in any city where the department of revenue maintains an office.
(Emphasis added.)
There are 158 fee agent offices in Missouri. At the time of Governor Bond's inauguration, 21 fee agent offices were operated by nonpartisan civic organizations, and one office was operated by a municipality. All other fee agent offices were held by Democrats who were appointed under the Teasdale administration. Since his appointment as Director of Revenue, James has terminated ten fee agent appointments held by Democrats and appointed agents to fill two vacant offices. All of the agents who have been appointed by James are Republicans.
5. While the Department of Revenue does exercise a modicum of control over the general operations of the fee agent offices, it leaves management functions to the fee agents. Although fee agents are required to deposit the money collected for taxes and fees in state accounts, their own fees need not be accounted for. Accounting reports and bank statements must be filed. Relocation of a fee agent office requires the prior approval of the Department of Revenue. Specific business hours are selected by the agent, subject to the approval of the DOR. The DOR also holds fee agent training seminars for fee agents and their employees. The DOR supplies each office with a person to act as photographer/vision tester for persons obtaining or renewing driver's licenses. The DOR also supplies each office with a Wide Area Telephone Service (WATS) line and lists fee agent offices under the heading of Department of Revenue in the telephone directory.
6. But the Department of Revenue does not supervise the daily operations of the fee agent offices. Fee agents are free to hire employees to operate the offices for them or they may operate the offices themselves without additional personnel. Plaintiff Schenberg worked in her office with three or four employees. Plaintiff Sweeney did not work in his office but hired ten employees and an additional vision tester. Plaintiff Riddler had eight employees. The state does not exert control over the selection or retention of the fee agent's office employees. As provided for in Mo.Rev.Stat. § 136.055, fee agents are not compensated by the state but instead are authorized to charge persons requiring their services $1.00 per transaction as compensation. Fee agents are free to select their office location (subject to DOR approval) and are required to pay their own operating expenses, including rent, employees' salaries, and office *127 equipment and supplies. Fee agents are permitted to engage in outside business activities and the majority do. Plaintiff Sweeney is an independent insurance agent. Plaintiff Briggs operates her office together with a restaurant. Fee agents pay self-employment taxes and are not members of the state retirement system. The Social Security Administration has determined that for Social Security tax purposes fee agents are not employees of the State of Missouri. In addition, with the exception of plaintiff Sweeney, none of the plaintiffs considered himself or herself an employee of the state.
Finally, and of particular importance, there is no DOR requirement that the fee agents actually work at all in their agencies. The DOR does require that the agents remain responsible for the work performed by their employees. The fee agents, like independent contractors, are merely responsible for supervision of their employees.
7. Plaintiff Schenberg operates the fee agent office in Creve Coeur, Missouri. In 1980, approximately 78,000 transactions occurred at her office, from which Schenberg netted $39,000.
8. Plaintiff Riddler operates the fee agent office in St. Charles. From approximately 135,000 transactions in his office in 1980, he netted between $25,000 and $26,000.
9. Plaintiff Briggs operates the fee agent office in Sikeston. In 1980, she netted between $15,000 and $20,000 from the 39,000 transactions made at her office.
10. Plaintiff Light operates the office in Rolla. She netted about $34,000 from the 49,000 transactions made at her office.
11. Plaintiff Sweeney operates the Moline Acres office. From approximately 120,000 to 130,000 transactions, Sweeney netted about $23,000.

Conclusions of Law
1. In 1976, the Supreme Court held that a non-policymaking, nonconfidential government employee cannot be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. Elrod v. Burns, 427 U.S. 347, 375, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). The plaintiffs in Elrod were non-civil-service employees of the Cook County, Illinois, Sheriff's Office, who held positions as the chief deputy, bailiff, and process server. It had been the practice for the incoming Sheriff of Cook County to replace such employees with members of his own party when the existing employees lacked or failed to obtain political support from the incoming Sheriff's party. Elrod at 350-51, 96 S.Ct. at 2678. The Court found that dismissing those employees because of their political beliefs violated the First and Fourteenth Amendments. Elrod, 373, 375. Justice Brennan's plurality opinion discussed several other aspects of the patronage system, including hiring practices, contract awards, and improved public services, but the Court expressly did not rule upon the applicability of the holding to any class other than patronage dismissal of employees.
It might be reasonable to infer from Justice Brennan's plurality opinion that patronage in all its varied forms was an impediment to First Amendment exercise, and that all such patronage practices would be subject to the same restrictions as patronage dismissals. But a careful reading of the concurring opinion of Justices Stewart and Blackmun, together with the limitations expressed by Justice Brennan,[2] constitutes the actual holding of the Court which is limited to patronage dismissals of nonpolicymaking and nonconfidential public employees.
2. Four years later, in Branti v. Finkel, 445 U.S. 507, 519, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980), the Supreme Court held that the continued employment of an assistant public defender could not properly be *128 conditioned upon his allegiance to the political party in control of the county government. Justice Stevens' majority opinion stated that "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; [but] rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." Branti at 518, 100 S.Ct. at 1295. Justice Stevens noted the sweeping language contained in the Elrod plurality opinion and stated "[i]n that case, as in this, however, the only practice at issue was the dismissal of public employees for partisan reasons. Elrod, 427 U.S. 353, 96 S.Ct. at 2679; id. at 374, 96 S.Ct. at 2690. In light of the limited nature of the question presented, we have no occasion to address petitioner's argument that there is a compelling governmental interest in maintaining a political sponsorship system for filling vacancies in the public defender's office." Branti 445 U.S. at 513, n.7, 100 S.Ct. 1292. (Emphasis added.)
3. The first issue to be determined is whether fee agents are "employees" of the State of Missouri, and, if not, whether the proscriptions of Branti should apply even in the absence of an employer-employee relationship. Missouri has adopted the test of the Restatement of Agency 2d, § 220, for determining whether an agent is an employee or an independent contractor. Cline v. Carthage Crushed Limestone Co., 504 S.W.2d 102 (Mo.1973).
The Restatement provides:
(1) A servant [employee] is a person employed to perform services in the affairs of another and who with respect to the physical conduct of the performance of the services is subject to the other's control or right of control.
(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered.
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.
4. The Court finds that fee agents are not employees of the State of Missouri but are more in the nature of independent contractors or franchisees. First, there is no requirement that fee agents actually work in their offices. Fee agents may select their employees and then delegate duties to them without DOR approval. Aside from accounting for the tax and license money collected, fee agents operate their offices with autonomy not generally accorded State employees. Fee agents supply, at their own expense, office space and equipment, and pay salaries determined by the agents. Fee agents may, and frequently do, engage in other business endeavors. They may locate their fee agent office in commercial facilities. Agents are not paid by the State, but instead are statutorily authorized to charge the public for their services.[3] Fee agents pay self-employment *129 taxes. They are not members of the state retirement system. With the exception of plaintiff Sweeney, none of the others considered themselves state employees. The control exercised by the state is de minimis when compared to the degree of freedom afforded fee agents over the general operation of their offices.
The establishment of fee agents has created a unique status for those holding these positions, quite unlike that of most secretaries, vision testers, cashiers, and clerks that work in the branch offices of the DOR.[4] Such employees make no policy, have no confidential relationship with the officials of state government, and are paid a salary for work that they themselves must perform. They clearly qualified for the protection enunciated in Elrod and Branti.
5. Since fee agents are not state employees, they are not protected from dismissal because of their political affiliations. The protections of Elrod and Branti were expressly limited to state employees and their narrow holdings do not protect plaintiffs herein. Accordingly, the Court holds that since fee agents are not state employees, their appointments may be properly terminated because of their political affiliation.
6. While the Court expressly feels that plaintiffs are not employees, and therefore not shielded by Elrod, even had the Court determined them to be employed by the state, they still would not prevail, for Branti makes the comment that where "party affiliation is an appropriate requirement for the effective performance of the office," patronage dismissal may be allowed. Branti 445 U.S. at 518, 100 S.Ct. at 1295.
The fee agents have more than five million contacts with the public during their term and do serve as selected emissaries of the incumbent administration and thus reflect its concern for courtesy, efficiency, and integrity. Unlike civil servants who remain during all administrations, the fee agents are symbols of the governor's office who do not bring the usual disadvantages of patronage employees to their posts. The unique structure of the fee agent position minimizes the usual deficiencies of patronage.
First of all, there is little or no additional cost to the government, for the fees of the agents are simply added to the costs of the licenses and taxes, thus allowing the state the full and complete measure of its taxing bounty.
Second, any citizen wanting to avoid the agent's small fee can seek out a branch office or utilize the mails to pay the license fees and taxes without paying the $1.00 fee. He may have to forego the convenience of location or scheduled availability, but that would be a luxury that he could judge the value of and accept or decline.
Third, the requirements for filling the position of fee agent are simple and generic, no special skill or professional knowledge is needed, and thus large numbers of individuals could easily qualify for the posts with little difficulty in completing the work required.
Fourth, while not requiring the confidentiality and policymaking function of the top-level positions in state government, there is the responsibility of demonstrating loyalty, efficiency, and partisan pride, which could be interpreted as a hallmark of the incumbent administration.
Fifth, the fee holder can delegate practically all of the chores and responsibility of *130 the office to others that he employs, and thus continue to actively and fully participate in the political activities of his choice without the restriction of a civil service code or the loss of services to the state.
Sixth, the novel status of motor vehicle license fee agents supports the argument that the state interest in having such an unusual arrangement is an intentional and planned circumstance, designed to meet and overcome the shortcomings of most patronage assignments.
In summary, then, the fee agents are extraordinarily suited for partisan, political appointment, and may well be a near perfect example of the kind of role suggested in Branti.
7. There is no serious contention by either party that the fee agents hold policymaking jobs, for they exercise little discretionary responsibility and have no supervisory function over any but their own employees. The collecting of fees and licenses is strictly determined by statute, and audit standards for the entire Department of Revenue are enforced generally by the fiscal arm of the agency.
8. Obviously, too, none of the fee agents now hold, nor would any of the Bond appointees hold, any confidential relationship to the Director of Revenue because of their fee agent status. In fact, they are hardly known to the Governor or his staff, but clearly are the selected choices of political leaders throughout the state who wish to reward party loyalty with a patronage "plum." If the Legislature believes a better approach would be to minimize this patronage, it might well enact legislation which would mandate a term concurrent with that of the Governor's, or provide only branch offices in the areas of high population (such as Moline Acres, Creve Coeur, and St. Charles), appointing fee agents in smaller or rural communities, or alternately, careful selection of municipalities or community organizations.
And yet, these fee agents, although non-policymaking, nonconfidential employees, are still not protected from patronage discharge, because Branti provides that, for some positions, "party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 518, 100 S.Ct. 1295. Fee agents are uniquely suited for that requirement.
9. It is apparent to this Court that partisan political affiliation played a substantial role in all of the dismissals. The evidence was replete with recommendations to Governor Bond by Republican leaders suggesting replacements for the Democratic incumbents. Defendant James testified that he believed fee agents must have partisan political allegiance in order to properly and loyally perform their functions; he indicated that recommendations by the Governor and his staff would be tantamount to appointment. While the evidence is perhaps minimally sufficient to sustain defendants' claim of discharge for cause against Sweeney and Riddler, it seems hardly sufficient to discharge a wife because of the sins of the husband, as in the Briggs matter, even if the recommendation to fire comes from a fellow Democrat. As to plaintiffs Schenberg and Light, not one word of criticism or complaint scorched their pages of performance. There was not one word of testimony offered or exhibit tendered to show that plaintiff Schenberg was guilty of any misconduct or nonfeasance in any respect. Indeed, the Court was duly impressed with the candor, apparent industry, and community concern of plaintiff Schenberg, who took her duties seriously and performed them personally in the manner of an exemplary public servant.
The dilemma as to the logical extension of the First Amendment rights in Elrod and Branti to patronage activities in our government has been illustrated well by the concurring and dissenting opinions of the Justices; they will surely require delineation in the future. But a trial court is bound, as it must and should be, by express limitations established by the U. S. Supreme Court and those limitations are patently clear in the Elrod and Branti opinions. The Supreme Court now requires that those to be protected must be employees.
*131 The Court is aware that the critical analyses of patronage in the opinions of the Supreme Court might someday lead to an extension of the protection now afforded. Other courts have found that the protections of Elrod and Branti extend to patronage hiring, demotions, and transfers, but in each case the disaffected party was clearly an employee. Tanner v. McCall, 625 F.2d 1183, 1189 (5th Cir. 1980); Johnson v. Bergland, 586 F.2d 993, 995 (4th Cir. 1978); Morris v. City of Kokomo, 381 N.E.2d 510, 518 (Ind.App.1978); McKenna v. Fargo, 451 F.Supp. 1355, 1377 (D.N.J.1978). It is conceivable that in addition to employees, this extension could well include awards of government contracts, licenses, franchises, and other government benefits. But now the holdings are expressly limited to the partisan dismissals of state employees. Unless it is enlarged by appellate review, this Court must abide by the present status of the law.
Accordingly, judgment is entered for the defendants and against the plaintiffs and the complaint is dismissed with prejudice at plaintiffs' costs.

ON POST-TRIAL MOTIONS
This matter is before the Court on various post-trial motions: the plaintiffs' motion for new trial or to alter or amend judgment, the applicants' motions to intervene, the plaintiffs' motion for an injunction pending appeal, and the defendants' motion for bond pending appeal.

Motion for New Trial or to Alter or Amend Judgment
The plaintiffs have filed a motion for a new trial or to alter or amend the judgment under Fed.R.Civ.P. 59.
A motion for a new trial or to alter or amend the judgment is addressed to the discretion of the trial judge. Voegeli v. Lewis, 568 F.2d 89, 94-95 (8th Cir. 1977). In ruling on such motions, the trial court must exercise its discretion to determine whether the judgment is supported by the law and the evidence presented. See Lincoln Carpet Mills, Inc. v. Singer Co., 549 F.2d 80, 82 (8th Cir. 1977).
The Court finds that the judgment is supported by the evidence presented at trial and the holdings of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Those cases prohibited the partisan dismissals of government employees. The holdings of Elrod and Branti were expressly limited to dismissals of employees and it was on that basis that the Court predicated its holding here. The evidence in this case showed that fee agents function in a capacity similar to that of independent contractors, and in the absence of restrictions commonly placed on employees. The Court engaged in a lengthy analysis of whether fee agents were "employees" of the state under Missouri law. See Conclusions of Law 3 and 4. The Court remains convinced that fee agents do not satisfy the requirements for employee status under Missouri law. The testimony of Governor Bond would not have altered that result. The Governor's influence in the selection and appointment of fee agents, or even their employees, would not have persuaded the Court that fee agents were subject to management by the Governor to be considered state employees. Accordingly, the plaintiffs' motion under Rule 59 will be denied.

Application to Intervene
Applicants Ellie O'Donnell, Denise Funderburk, and Terry Cole have filed motions to intervene under Fed.R.Civ.P. 24. These applicants are persons chosen by the Director of Revenue to succeed three of the plaintiffs herein.
Under Rule 24, applications to intervene must be timely. U.S. v. First Fidelity Bank of Colome, 631 F.2d 568, 569 (8th Cir. 1980); McClain v. Wagner Electric Corp., 550 F.2d 1115, 1120 (8th Cir. 1977). Whether an application is timely is within the discretion of the trial judge. McClain; U. S. v. Associated Milk Producers, Inc., 534 F.2d 113, 115 (8th Cir. 1976). Timeliness must be evaluated in light of the material facts and circumstances of each case. *132 McClain; Nevilles v. E.E.O.C., 511 F.2d 303, 305 (8th Cir. 1975). Generally, applications for intervention made after the entry of final judgment will be granted only upon a strong showing of entitlement and justification for failure to request intervention sooner. McClain; Associated Milk Producers at 116.
The applicants have not demonstrated their entitlement to intervene here. First, none of these applicants was appointed before this litigation commenced and none of their appointments has become effective. These applicants have not assumed the duties of being fee agents and, as such, none is suffering a reduction of income. Second, the present defendants have adequately and competently represented the interests of the persons that the Bond administration wishes to appoint as fee agents, and the Court finds that no divergence of interest has occurred. Third, permitting the applicants to intervene at this late stage would disrupt the orderly processes of the Court. Judgment had been entered and postjudgment actions filed before these applicants sought intervention. At least one applicant, Terry Cole, knew of his prospective appointment as early as February, 1981. Intervention at this point would not promote the ultimate resolution of this litigation. Accordingly, the applications to intervene will be denied.

Injunction Pending Appeal
Plaintiffs have filed a motion for an injunction pending appeal under Fed.R. Civ.P. 62(c).
Rule 62(c) provides, in part:
When an appeal is taken from ... [a] final judgment ... denying an injunction, the court in its discretion may suspend ... [or] grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party ....
Generally, under Rule 62(c), the moving party must show: (1) a likelihood of prevailing on the merits on appeal; (2) irreparable injury to the moving party would result unless the injunction is granted; (3) no substantial harm to the other interested parties would result from the issuance of the injunction; and (4) issuance of the injunction would not harm the public interest. Kansas City Royals Baseball Corporation v. Major League Baseball Players Association, 409 F.Supp. 233, 263 (W.D.Mo.1976); see Belcher v. Birmingham Trust National Bank, 395 F.2d 685, 686 (5th Cir. 1968); Long v. Robinson, 432 F.2d 977, 979 (4th Cir. 1970).
Clearly, any trial judge is reluctant to find that a substantial likelihood exists that he or she will be reversed. As a result, trial courts have issued or stayed injunctions pending appeal where such action was necessary to preserve the status quo or where the legal questions were substantial and matters of first impression. See Mesabi Iron Co. v. Reserve Mining Co., 268 F.2d 782, 783 (8th Cir. 1959); Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C.Cir.1977); Parks v. "Mr. Ford", 386 F.Supp. 1251, 1270 (E.D.Pa.1975); accord, North Central Truck Lines, Inc. v. U. S., 384 F.Supp. 1188, 1191 (W.D.Mo.1974) (stay pending appeal denied where action did not present new legal questions which might reflect on substantive correctness of injunctive order). The District of Columbia, the Second and the Ninth Circuits have adopted the approach that an injunction pending appeal is appropriate where serious legal questions are presented and the balance of hardships tips sharply toward the moving party. Holiday Tours at 844; Charlie's Girls, Inc. v. Revlon, Inc., 483 F.2d 953, 954 (2d Cir. 1973); Costandi v. Aamco Automatic Transmissions, Inc., 456 F.2d 941, 943 (9th Cir. 1972); see Evans v. Buchanan, 435 F.Supp. 832, 843-44 (D.Del.1977). These courts have recognized that under Rule 62(c), courts may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained. Holiday Tours at 844-45.
Under this standard, the Court finds that this case presents serious legal questions of *133 first impression. No state or federal court has addressed the question whether Elrod v. Burns and Branti v. Finkel apply to persons other than employees. Only one court has considered the question of employee status under Elrod and Branti. McMullan v. Thornburgh, 508 F.Supp. 1044, 1046 (E.D. Pa.1981). McMullan held that state Department of Health registrars were employees within the ambit of Elrod and Branti. Although this Court does not doubt the correctness of its own findings, it recognizes that the issues here present substantial and novel questions which are fair ground for litigation. Accordingly, the Court finds that the first criterion of Rule 62(c) is satisfied.
Denial of an injunction pending appeal would cause irreparable injury to the plaintiffs. In the absence of such an injunction, these plaintiffs undoubtedly will lose their fee agent offices. The loss of their appointments would force these plaintiffs to terminate their employees, office leases, and other commitments. There would be no means for these plaintiffs to recoup interim fees should the plaintiffs prevail on appeal. Such fees would be paid to their successors, not to the State of Missouri. These considerations persuade the Court that irreparable injury to the plaintiffs would result if the injunction is denied.
On the other hand, these defendants and the persons appointed to be the successor fee agents would not suffer substantial harm from the issuance of an injunction. The State would continue to collect its revenues, fully and without interruption. Those persons appointed to be the successor fee agents, only two of whom are parties, would not suffer a reduction of any present income, nor would they be required to terminate their subordinates' employment. Any harm that would befall the defendants from the issuance of an injunction would be substantially less than harm to plaintiffs should the injunction be denied. The absence of substantial harm to the defendants favors the issuance of the injunction.
Last, the Court finds that the public interest would be served by the issuance of an injunction pending appeal. As stated above, the State would continue to receive its revenues. In addition, the public would be provided with the services of the fee agents without disruption. If the injunction were denied, and the judgment reversed on appeal, fee agent offices might be terminated, moved, and subsequently terminated and moved again, all to the public's detriment. A definitive ruling from the Court of Appeals before termination of the fee agent offices would be in the public interest. Of course, the Director of Revenue remains free to discharge any of these plaintiffs for cause during the pendency of the appeal.
The Court concludes that the plaintiffs have met the requirements of Rule 62(c) and that an injunction pending appeal is appropriate. This action presents novel and substantial legal questions and the balance of the equities of the case requires that the status quo be maintained until the Court of Appeals decides otherwise. The Court further finds that a three thousand dollar ($3,000) cash bond is proper for the security of the defendants' rights.
SO ORDERED.
NOTES
[1] The defendants have agreed to postpone the effective dates of the terminations pending the outcome of this case.
[2] Justice Brennan recognized "[a]lthough political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons. Elrod, 427 U.S. at 353, 96 S.Ct. at 2679. (Emphasis added.)
[3] Plaintiff Sweeney has incorporated his business interests and fee agent office so that his income is a salary from that corporation.
[4] See memorandum and order of Judge Meredith in Kaegel v. Teasdale, No. 78-0086-1 (E.D.Mo. 2/18/78), in which secretaries, vision testers, cashiers and clerks were given injunctive relief protecting them from partisan dismissal.

It must be abundantly clear that such state employees in the branch offices are model candidates for such protection. Unlike the fee agents, they hold relatively low paid positions with absolutely no policymaking, supervisory, or confidential relationship. They must work full-time in their jobs; rarely are they holders of rank in political organizations, nor do they have titles, or any other income producing activity, and exert little influence or persuasion in governmental decision.